## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARBARA EVANS,** | : | **CIVIL ACTION NO. 1:19-CV-497** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CAPITAL BLUE CROSS,** | : | |
| | : | |
| **Defendant** | : | |

### <u>MEMORANDUM</u>

Plaintiff Barbara Evans (hereinafter "Ms. Evans" or "Evans") advances claims for discrimination, retaliation, and violation of Pennsylvania state law against her former employer, Capital Blue Cross. Before the court are Capital Blue Cross's motion for summary judgment as to each of Evans' claims, and Evans' motion for partial summary judgment as to her disability-based discrimination claim. For the following reasons, we will deny Evans' motion for partial summary judgment and Capital Blue Cross's motion to strike. We will grant in part and deny in part Capital Blue Cross's motion for summary judgment.

I.   **Factual Background & Procedural History**[1]

Capital Blue Cross is a Pennsylvania nonprofit corporation that issues and
administers healthcare benefit programs in Pennsylvania.  (Doc. 29 ¶¶ 5, 6; Doc. 30
¶¶ 5, 6).  Ms. Evans is a Black female who began her employment with Capital Blue
Cross in June of 2002.  (Doc. 50-2 ¶¶ 2, 3).  She was initially hired as a Customer
Service Representative and was subsequently promoted to Senior Customer
Service representative in December of 2006, to Technical Assistant in October of
2007, and to Customer Analyst in May of 2009.  (Id. ¶¶ 4-7).  Her last promotion was
in March of 2015 to Senior Commercial Appeals and Grievance Resolution
Specialist in the Commercial Appeals and Grievance Department.  (Id. ¶ 8).

Ms. Evans was assigned to Capital Blue Cross's Tecport office until late 2012
or early 2013, when she was relocated to the Elmerton office.  (Doc. 42 ¶ 12; Doc. 47
¶ 12; Doc. 50-1 at 8; Doc. 50-2 ¶ 13).  Evans' supervisor at the Elmerton facility was

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to
Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise
statement of the material facts, in numbered paragraphs, as to which the moving
party contends there is no genuine issue to be tried."  M.D. PA. L.R. 56.1.  A party
opposing a motion for summary judgment must file a separate statement of material
facts, responding to the numbered paragraphs set forth in the moving party's
statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted,
the factual background herein derives from the parties' Rule 56.1 statements of
material facts.  (See Docs. 36, 50-2, 42, 47).  To the extent the parties' statements are
undisputed or supported by uncontroverted record evidence, the court cites
directly to the statements of material facts.

For ease of reference, we cite to all record evidence by the page number on
the header supplied by our Case Management and Electronic Case Filing system.
(See Docs. 36-1, 38, 39-3, 39-4, 39-5, 43-1, 50-2).  Where a party's Rule 56.1 response is
unsupported, we deem the fact it responds to as uncontroverted.  M.D. PA. L.R. 56.1.
Part and parcel of this process, we have scrutinized the parties' Rule 56.1
documentation and independently considered the entire record.

Melissa Schreck. (Doc. 50-2 ¶ 14). Between 2010 and December of 2012, Evans participated in the company's work-from-home program, (id. ¶ 9; Doc. 50-1 at 7), and received positive reviews, (see Doc. 42 ¶¶ 7-10; Doc. 47 ¶¶ 7-10).[2]

### A.   Requests for Disability Accommodations

Ms. Evans began to experience allergy symptoms in the late 1990s. (Doc. 50-1 at 6). In 2006, she began treatment with Robert Zuckerman, MD, a specialist in allergy and asthma conditions. (Doc. 42 ¶ 3; Doc. 47 ¶ 3). Dr. Zuckerman diagnosed Evans with asthma, allergic rhinitis, and sinusitis. (Doc. 42 ¶ 4; Doc. 47 ¶ 4).

Evans claims that the workplace conditions at Capital Blue Cross's Elmerton facility exacerbated her symptoms. She asserts that, over a one-and-a-half-year period, she made several requests for air quality and mold testing for her cubicle. (Doc. 50-2 ¶ 16; Doc. 57 at 5; Doc. 57-1 at 7). Specifically, Evans believed a panel on the partition at her cubicle desk was covered in mold spores. (Doc. 50-2 ¶ 18). She testified that, during 2014, she would experience allergy symptoms 10 to 15 minutes after entering the Elmerton facility and that, at some point in 2014, she asked Capital Blue Cross to replace the suspect panel, have it professionally cleaned, or move her to another desk. (Id. ¶¶ 17, 19; Doc. 36-1 at 85).

The record reflects that in May and June of 2014, Evans requested to work from home due to illness, (Doc. 42 ¶ 72; Doc. 47 ¶ 72), and to work "in a less stressful

---

[2] In May of 2014, in response to federal regulatory issues, (see Doc. 50-2 ¶ 11), Capital Blue Cross recalled all of its work-from-home employees handling correspondence or appeals to the Elmerton office, effective July 14, 2014, (see Doc. 36-1 at 53). Evans' recall from the work-from-home program predated these sanctions. (See Doc. 50-2 ¶ 12; Doc. 50-1 at 7).

environment," (Doc. 43-1 at 54; see also Doc. 42 ¶ 73; Doc. 47 ¶ 73).  Internal emails

among managerial staff[3] conclude that the company could not accommodate her

request, (Doc. 42 ¶ 73; Doc. 47 ¶ 73), and on October 3, 2014, a human resources

employee advised Ms. Evans via email of this decision, (Doc. 43-1 at 55).  Capital

Blue Cross asserts that its denial was consistent with its decision to terminate its

work-from-home policy for certain positions in May of 2014.  (Doc. 47 ¶ 73); see also

supra at 3 n.2.  Evans inquired as to the availability of other positions that would

allow her to work from home, but management advised her that there were no

openings.  (Doc. 43-1 at 56-57).

On November 5, 2014, Dr. Zuckerman wrote to Capital Blue Cross and

explained:

> We treat [Evans] for recurrent sinusitis and allergy.  Part
> of her care includes avoiding triggers in her environment.
> She has indicated that she wants to use an air filter at her
> work due to excessive dust and mold in the air which is
> known to trigger her respiratory problems.  I agree that
> this is a medical necessity.  Please make accommodations
> so that she can keep an air filter at her desk.

(Doc. 42 ¶ 27; Doc. 47 ¶ 27).  Dr. Zuckerman also issued Evans a prescription for a

"Filter Air PP hepa style for an open space at work," (Doc. 42 ¶ 28; Doc. 47 ¶ 28),

which he reissued on May 22, 2015, (Doc. 42 ¶ 29; Doc. 47 ¶ 29).  In addition to Dr.

Zuckerman's recommendation, Sue Blumenschein—a trained nurse who worked at

---

[3] By email dated May 29, 2014, Charmaine Morrissey, Capital Blue Cross's
Occupational Health Nurse, broached Evans' request with Maureen Fairbanks,
Kieran Hull, and Heather Wright.  (Doc. 42 ¶ 72; Doc. 47 ¶ 72; Doc. 43-1 at 54).
Maureen Fairbanks is a Human Resource Specialist.  (Doc. 43-1 at 55).  Kieran Hull
is a Senior Director of Human Resources.  (Id. at 54).  Heather Wright is a Health
Suite Assistant in the human resources department.  (Id. at 75).

the Elmerton facility—diagnosed Evans with rhinitis and recommended that she use an air purifier at her desk. (Doc. 42 ¶¶ 20-22; Doc. 47 ¶¶ 20-22).

Evans reiterated her concerns about suspected mold in her workplace to Schreck at some point in early March of 2015. (See Doc. 47-1 at 47). After Schreck raised this complaint internally,[4] (Doc. 50-2 ¶ 16; Doc. 47-1 at 47), Capital Blue Cross management enlisted Michael Ketner, its Director of Facilities, to investigate the suspect workspace, (see Doc. 47-1 at 47). Ketner examined the panel under Evans' workspace and, after observing a stain, asked one of his associates to try to extract it. (Doc. 36-1 at 77). In a reply email, Ketner's associate reported he had "extracted under the workstation panel with a couple of different chemicals, including disinfectant" and that, in his view, the stain "appeared to be something to the effect of grape kool-aid/soda or a blue slushie type drink. It is not mold!" (Id.) Ketner forwarded this email to Schreck, who replied that she "spoke to [Evans] and she is fine with the panel." (Id.) Evans denies making such a statement. (Doc. 50-1 at 15). She testified that the panel looked virtually no different after Ketner's team cleaned it, and that she could still see "black stuff . . . with the little white spots on it" under the stain. (See id.)

---

[4] Schreck raised this issue with Sue Lamason, title unknown, (Doc. 42 ¶ 36), and Alisa McClurkin, a manager of Customer Service, (Doc. 50-2 ¶ 16; Doc. 47-1 at 47).

On May 21, 2015, Lisa Owens—a Caucasian employee[5] slated to replace Evans in her cubicle—advised Schreck that she did not want to move to a cubicle with mold and that Schreck should find her another location or replace the panel. (Doc. 42 ¶ 40).  Email records suggest Evans and Owens met with Wright on May 22, 2015, to express their concerns regarding the panel and the potential mold.  (Id. ¶ 41).  The same day, Schreck alerted her colleagues to the continued complaints of mold on the panel and Evans' request to have the air quality tested.  (Id. ¶ 42; Doc. 47 ¶ 42).  When asked for his opinion, Ketner stated that he stood by his original conclusions but would have his team test for mold.  (See Doc. 42 ¶¶ 42-44; Doc. 47 ¶¶ 42-44).  According to Ketner's declaration, he ordered mold test kits for the panel on or before May 22, 2015.  (Doc. 36-1 at 119; see also Doc. 43-1 at 82).

After learning that Owens also requested testing and that both Evans and Owens "questioned the integrity of the mold test kit," Ketner arranged for Cocciardi and Associates ("Cocciardi") to conduct an indoor air quality investigation, including mold and mold spore testing.  (Doc. 36-1 at 119-20).  Cocciardi conducted its investigation on May 26, 2015, during which it "assess[ed] general indoor air quality parameters and airborne fungal concentrations."  (Id. at 68).  That same day, Wright directed Evans to attend an examination with WORKNET Occupational Medicine for a possible worker's compensation claim regarding her respiratory conditions.  (Doc. 42 ¶ 31; Doc. 47 ¶ 31).  WORKNET's

---

[5] Evans does not cite evidence establishing Owens' status as Caucasian.  (See Doc. 50 at 28).  However, Capital Blue Cross does not dispute this representation, and we therefore assume its truth for purposes of the instant motion.

notes are dated May 26, 2015, July 14, 2015, and February 23, 2016.  (Doc. 42 ¶ 32; Doc. 47 ¶ 32).  The May 26, 2015 note states "Recommend: Air quality testing and HEPA filter use. Starting 5/26/15 Continuing."  (Doc. 42 ¶ 33; Doc. 47 ¶ 33).

On May 28, 2015, Cocciardi's representative advised Ketner that "there are no issues and that the air quality is one of the best reports that he has ever seen.  No spores, no mold, nothing."  (Doc. 42 ¶ 55; Doc. 47 ¶ 55).  Cocciardi issued its official report to Ketner the next day.  (Doc. 42 ¶ 58; Doc. 57 ¶ 58).  According to the report, there were "[n]o visible signs of fungal growth in any of the areas inspected."  (Doc. 42 ¶¶ 59, 60; Doc. 47 ¶¶ 59, 60).  The air quality in Capital Blue Cross's facility was, according to Cocciardi's representative, "better than most places I've seen over the years."  (Doc. 36-1 at 108).  Evans reviewed the Cocciardi report with her physician. (Doc. 47-1 at 10).

Although the exact timing is unclear, it is undisputed that Evans was eventually moved to another desk, (Doc. 47-1 at 12), likely at the end of May or the beginning of June of 2015, (see Doc. 43-1 at 82-83).[6]  On June 12, 2015, a WORKNET physician assistant again recommended that Evans have an air filter at her desk. (Doc. 36-1 at 57-58).  On June 23, 2015, Morrissey emailed Evans and directed her to ask her physician for more information about an adequate filter, including a website, name, or model number.  (Doc. 39-6 at 88).

---

[6] Capital Blue Cross states it relocated Evans within two weeks of May 26, 2015.  (Doc. 50-2 ¶ 42).  However, the cited deposition testimony appears to explain that Evans' relocation occurred two weeks after she sought removal of several plants near her desk.  (See Doc. 36-1 at 89-90).

The parties dispute whether Evans provided Capital Blue Cross with the necessary information regarding a suitable air filtering device. Evans testified that, in 2015, she gave the employee health suite at Capital Blue Cross a printout that Dr. Zuckerman had provided her about a battery-operated air filter device. (See Doc. 50-1 at 11). Morrissey denies receiving information about the device. (Doc. 47-1 at 63; see also id. at 67). On July 14, 2015, a WORKNET doctor issued Evans a prescription for "HEPA filter due to possible work-related Allergy Asthma symptoms." (Doc. 42 ¶ 34; Doc. 47 ¶ 34). Ketner testified that Evans did not get approval for a HEPA filter because she failed to supply necessary details about the filter. (Doc. 42 ¶ 83; Doc. 47 ¶ 83).

In sum, the record is very unclear as to the status of the air filter request at various points in time, as well as the status of any further accommodation for Evans after she moved to a new desk in late Spring 2015. On January 20, 2016, Evans requested transfer to another supervisor and, once again, sought the opportunity to work from home. (Doc. 42 ¶ 75; Doc. 47 ¶ 75). Evans thereafter submitted yet another request to work from home due to her doctor's recommendation. (Doc. 42 ¶ 76; Doc. 47 ¶ 76).

### B.    Additional Allegations

Evans asserts discrimination, retaliation, and hostile work environment claims in addition to her failure-to-accommodate claim. Evans alleges Ketner retaliated against her for making disability-based accommodation requests when he removed a high-back chair from her desk during Cocciardi's investigation. (Doc. 29 ¶ 84). Capital Blue Cross authorized high-back chairs for managers and for

nonmanagement employees with appropriate medical documentation. (Doc. 50-2 ¶ 44). Ketner testified that nonmanagement employees frequently commandeered high-back chairs from vacant offices without authorization; when he found unauthorized employees with high-back chairs, he routinely confiscated them. (Doc. 36-1 at 117).[7] Ketner explained that, while testing for mold, he saw a high-back chair at Evans' desk, checked to see if she had approval, and when he learned she did not, replaced the high-back chair with a low-back chair. (Id.)

In her complaint, Evans also alleges Capital Blue Cross subjected her to both specific acts of race discrimination and a hostile work environment based on her race. (Doc. 29 ¶¶ 89-93, 98-104). She claims Schreck discriminated against her by, *inter alia*, subjecting her to increased scrutiny and oversight, giving her excessive work assignments, requiring her to provide notice for breaks, and requiring her to provide notice before working overtime. (See Doc. 29 ¶¶ 44-49; see also Doc. 50-2 ¶ 47). Evans avers none of her Caucasian or Asian coworkers were subject to similar treatment. (Doc. 29 ¶¶ 44-51).

Capital Blue Cross rejoins that Evans complained of race discrimination for the first time on January 15, 2016, when she filed an internal complaint alleging various forms of discrimination and retaliation. (Doc. 50-2 ¶ 49). An investigation by the human resources department found insufficient evidence to corroborate her claims. (Id. ¶ 50; Doc. 36-1 at 55). Deposition testimony from other Capital Blue

---

[7] Evans attempts to rebut this assertion with reference to deposition testimony omitted from the record. (See Doc. 50-2 ¶ 44 (citing "ECF 39, Exh. B, Owens Deposition at 31:-33:2 [sic]"); Doc. 39-5, Ex. B (containing pages between one and 21)).

Cross employees demonstrates Schreck had an intense, confrontational, and difficult management style.  (Doc. 36-1 at 125-127, 134; <u>see also</u> Doc. 50-2 ¶ 53).  They also testified, however, that they did not believe Schreck to be racist, (Doc. 36-1 at 131), and that Schreck did not treat Evans differently because of her race, (<u>id.</u> at 134).

### C.      Evans' Departure from Capital Blue Cross

Evans ended her employment with Capital Blue Cross in June of 2016.  (<u>See</u> Doc. 36-1 at 78).  Since then, she has allegedly suffered from blackouts, anxiety attacks, and loss of bodily functions, but she is able to perform limited tasks, like babysitting, going to doctor appointments, and picking up prescriptions.  (Doc. 50-2 ¶ 62).  Evans has filed a state-court action against Capital Blue Cross for denial of disability income benefits.  In her state-court action, Evans pled that she has been unable to work since March of 2016 due to manifestations of mental health conditions.  (<u>Id.</u> ¶ 63).  She also pled that she has applied for Social Security Disability benefits.  (<u>Id.</u> ¶ 64).

### D.      Procedural History

Evans filed her initial complaint in March of 2019.  She filed an amended complaint in April of 2019, and thereafter sought leave to file a second amended complaint, which we granted.  Evans asserts claims for discrimination (Count I) and retaliation (Count II) in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, *et seq.*; race-based (Count III) and sex-based discrimination (Count IV) in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2, *et seq.*; race-based discrimination (Count V) and retaliation (Count VI) in violation of

42 U.S.C. § 1981; and violation of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 PA. STAT. AND CONS. STAT. ANN. § 260.1, *et seq.* (Count VII). Capital Blue Cross answered the complaint and denied each claim.

## II.   <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." <u>Thomas v. Cumberland County</u>, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. <u>See</u> <u>Pappas</u>, 331 F. Supp. 2d at 315.

Federal Rule of Civil Procedure 56(c) requires movants and nonmovants alike to support factual assertions by "citing to particular parts of materials in the record" or otherwise "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c). Rule 56(e) allows the court to deem undisputed any fact not properly countered by record evidence. <u>See</u> FED.

R. Civ. P. 56(e)(2).  Local Rule of Court 56.1 undergirds these principles by requiring Rule 56 motions to "be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. Pa. L.R. 56.1.  Local Rule 56.1 further requires the nonmovant to file a responsive statement identifying genuine issues to be tried and mandates that both parties' submissions "include reference to the parts of the record that support the statements."  Id.

Courts may resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. FedEx, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2720 (3d ed. 2015).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  Fed. R. Civ. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

### III.   Discussion

Capital Blue Cross seeks summary judgment as to each of Evans' claims.[8] Evans only seeks summary judgment on her ADA discrimination claim.  As we explain *infra*, Evans' disability discrimination claim survives, so we must also take up Capital Blue Cross's motion to strike.  We do so at the outset.

### A.   Motion to Strike

Capital Blue Cross asks us to strike expert materials submitted by Evans' treating physician, Robert Zuckerman, MD, FACAI, FAAP.  Capital Blue Cross asserts that Dr. Zuckerman fails to offer an admissible opinion regarding causation for purposes of her ADA claim.  (Doc. 63 at 3-4).

Rule 26(a)(2) requires litigants to disclose the identity of any individual who may provide expert testimony.  See FED. R. CIV. P. 26(a)(2)(A).  Witnesses "retained or specially employed to provide expert testimony" or "whose duties as the party's

---

[8] Evans fails to respond to Capital Blue Cross's substantive arguments regarding her sex discrimination, WPCL, and race retaliation claims.  (See Doc. 50). We thus conclude that she has abandoned these claims.  See Malibu Media, LLC v. Doe, 381 F. Supp. 3d 343, 361 (M.D. Pa. 2018) (Conner, C.J.) (citing Stauffer v. Navient Sols., LLC, 241 F.Supp.3d 517, 519 n.3 (M.D. Pa. 2017) (Conner, C.J.) (collecting cases)).   Based upon the record before us, we surmise that Evans' failure to respond is intentional, resulting from a lack of evidentiary support.  To be clear, however, the court finds that Evans has not adduced evidence creating genuine disputes of material fact.  See Player v. Motiva Enters., LLC, 240 F. App'x 513, 522 n.4 (3d Cir. 2007) (nonprecedential) (citing Childers v. Joseph, 842 F.2d 689, 694-95 (3d Cir. 1988)).  Indeed, she fails to rebut Capital Blue Cross's relevant statements of material fact.  (See, e.g., Doc. 50-2 ¶¶ 58-61) (WPCL); id. ¶¶ 55-57 (sex discrimination); id. ¶¶ 49, 51, 52 (race retaliation)).  Summary judgment is "put up or shut up time" for the nonmovant.  See Daubert v. NRA Grp., 861 F.3d 382, 391 (3d Cir. 2017) (citation omitted).  Evans has failed to establish facts creating a genuine dispute as to these claims, and Capital Blue Cross is therefore entitled to judgment as a matter of law.  See Anchorage Assocs. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990).

employee regularly involve giving expert testimony" must also provide a written expert report. FED. R. CIV. P. 26(a)(2)(B). All other experts must disclose the subject matter of their expert testimony and a summary of the facts and opinions to which they expect to testify. FED. R. CIV. P. 26(a)(2)(C).

Treating physicians may testify as lay witnesses regarding diagnosis and treatment in certain circumstances. See Pease v. Lycoming Engines, No. 4:10-CV-843, 2012 WL 162551, at *12 (M.D. Pa. Jan. 19, 2012) (Conner, J.) (citing Allen v. Parkland Sch. Dist., 230 F. App'x 189, 194 (3d Cir. 2007) (nonprecedential); Collins v. Prudential Inv. and Ret. Servs., 119 F. App'x 371, 379 (3d Cir. 2005) (nonprecedential); Haines v. Davies, No. 1:07-CV-851, 2009 WL 331433, at *3 (M.D. Pa. 2009)). Treating physicians must also be disclosed as experts under Rule 26(a)(2)(A) if their "testimony on prognosis and causation will inherently be based on scientific, technical, or other specialized knowledge." Id. (citations and internal quotation marks omitted). They are not, however, required to provide Rule 26(a)(2)(B) expert reports "if they form their opinion on causation or prognosis as part of the ordinary care of a patient." Id. They need only provide the subject matter and a summary of their expected testimony, as well as the facts and opinions to which they expect to testify. FED. R. CIV. P. 26(a)(2)(C); see Hunter v. Kennedy, No. 3:17-CV-7, 2018 WL 6322909, at *2-3 (M.D. Pa. Dec. 4, 2018); Longo v. Hanger Prosthetics & Orthotics, Inc., No. 3:12-CV-2445, 2015 WL 915479, at *3-4 (M.D. Pa. Mar. 3, 2015).

Dr. Zuckerman may testify as a lay witness as to Ms. Evans' diagnosis and treatment, and as an expert as to treatment-based prognosis and causation, but he

was not required to write a Rule 26(a)(2)(B) expert report. Dr. Zuckerman's summary and declaration each clarify that he is one of Evans' treating physicians. (See Doc. 49-1 at 4; Doc. 39-4 at 9). They further clarify that his opinions are based on his "personal examination and knowledge" of Evans as her doctor. (Doc. 49-1 at 4; Doc. 39-4 at 9; see also Doc. 62 at 9). Dr. Zuckerman's opinion is based on information learned during his treatment of Ms. Evans, so he is not subject to Rule 26(a)(2)(B)'s reporting requirements and his summary will suffice. Of course, if Dr. Zuckerman testifies and strays beyond the scope of his care and treatment of Ms. Evans, Capital Blue Cross may reassert its challenge.

We now consider whether opinions expressed in Dr. Zuckerman's filings are admissible. Capital Blue Cross argues that, whether Dr. Zuckerman is an expert witness or a lay witness, we should exclude his declaration and testimony summary because they offer an inadmissible opinion on causation. (See generally Doc. 63). Capital Blue Cross appears to advance two theories in support of this argument. *First*, it contends that Dr. Zuckerman failed to employ a defensible scientific method. *Second*, it asserts that Dr. Zuckerman's declaration delves into subject areas on which he is not competent to express an opinion.

A "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). Furthermore, district courts must act as "gatekeepers" and ensure that expert testimony satisfies Rule 702. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591 (1993). That is, they must "(1) confirm the witness is a qualified expert; (2) check

the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 832 (3d Cir. 2020) (citing Daubert, 509 U.S. at 591).

Under Federal Rule of Evidence 702, a witness may be qualified by virtue of their "knowledge, skill, experience, training, or education." FED. R. EVID. 702.  In other words, a "broad range of knowledge, skills, and training qualify an expert." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994)).  This qualification requirement is liberally applied, id. (citing Schneider ex rel. Est. of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003); In re Paoli, 35 F.3d at 741-42), and an expert witness is qualified if they "possess specialized expertise," id. (citing Schneider, 320 F.3d at 404).  To be reliable, expert testimony must be "based on the methods and procedures of science, not on subjective belief and unsupported speculation." Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 80-81 (3d Cir. 2017) (quoting In re TMI Litig., 193 F.3d 613, 703-04 (3d Cir. 1999), as amended, 199 F.3d 158 (3d Cir. 2000)).

At this juncture, we decline to exclude Dr. Zuckerman's submissions.  Capital Blue Cross has not submitted a deposition transcript or indicated that it deposed Dr. Zuckerman, and thus offers no evidence to undermine his opinion regarding the cause or aggravation of Evans' symptoms.  By its very nature, Dr. Zuckerman's summary of his expected testimony does not provide a detailed accounting of the

16

bases for his opinion.  It provides only a general overview of his treatment of Evans and his opinion that her symptoms became aggravated after transferring to the Elmerton facility.  Absent a more developed record, we cannot conclude that his opinions are rooted in an unsound methodology.

For many of the same reasons, we are unable to determine whether Dr. Zuckerman is competent or qualified to testify as to each of the representations made in his summary.  Capital Blue Cross argues that Dr. Zuckerman has ventured outside his area of expertise by discussing the results of the Cocciardi test and their relevance to Evans' condition.  (Doc. 63 at 8).  Capital Blue Cross, however, has not performed any sort of *voir dire* that would enable the court to make a reasoned judgment as to Dr. Zuckerman's qualifications regard air quality testing.  Capital Blue Cross contends that Dr. Zuckerman's materials do not describe any "training, certification, or expertise in *setting up* tests for air quality or *testing* the particular matter gather in the testing of air quality."  (Doc. 63 at 9).  Dr. Zuckerman's purported lack of experience in performing tests—even if true—does not *per se* preclude him from being qualified to draw reasonable inferences from the results of tests set up or performed by others.  It is possible that Dr. Zuckerman, through his education, training, or experience in treating allergy patients, has the requisite

knowledge to opine on the significance of air quality test results.  Based on the present record, we cannot exclude Dr. Zuckerman's submissions.[9]

### B.    Disability Discrimination

Evans and Capital Blue Cross both seek summary judgment on Evans' disability discrimination claim under the ADA.  Capital Blue Cross argues, as a threshold matter, that Evans' status as a qualified individual is limited in scope by her termination and the doctrine of judicial estoppel.  The parties then dispute whether Capital Blue Cross made reasonable accommodations, engaged in the interactive process, and would have suffered undue hardship if it had adopted Evans' proposed accommodations.

The ADA mandates that an employer may not "discriminate against a qualified individual on the basis of disability in regard to . . . hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The ADA protects against discriminatory employment actions, including failure to reasonably accommodate an individual's disability.  See id. § 12112(b)(5)(A)-(B).  To make out a *prima facie* case of discrimination under the ADA, a plaintiff must establish (1) she has a disability, (2) she is a "qualified individual," and (3) the plaintiff suffered an

---

[9] The court will, to the extent necessary, hold a pretrial hearing to address Dr. Zuckerman's qualifications and the reliability of his methods.  At the hearing, Capital Blue Cross will have an opportunity to challenge, and Evans will have an opportunity to substantiate, Dr. Zuckerman's qualifications and methods.  The court assumes that Capital Blue Cross will depose Dr. Zuckerman in advance of trial to further clarify his qualifications and methodology and that the parties will endeavor to resolve the contretemps over his testimony.

adverse employment action.  Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir.

2002).  An employer's refusal to make reasonable accommodations for an

employee's disability or failure to engage in "reasonable efforts to assist the

employee and to communicate with the employee in good faith" constitute adverse

employment actions.  See Colwell v. Rite Aid Corp., 602 F.3d 495, 504 (3d Cir. 2010)

(citation omitted).  The burden of establishing a *prima facie* case "is not onerous,"

Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 365 (3d Cir. 2008) (quoting Tex. Dep't

of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)), and presents a "low bar" for

employment-discrimination plaintiffs, see Scheidemantle v. Slippery Rock Univ.

State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (citation omitted).

### 1.    *Qualified Individual and Judicial Estoppel*

The ADA defines "qualified individual" as "an individual who, with or

without reasonable accommodation, can perform the essential functions of the

employment position."  42 U.S.C. § 12111(8).  Courts look to the time of the adverse

employment action in determining whether an individual is qualified.  See Gaul

v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998).  "Each incident of

discrimination and each retaliatory adverse employment action constitutes a

separate actionable 'unlawful employment practice.'"  Nat'l R.R. Passenger Corp.

v. Morgan, 536 U.S. 101, 114 (2002).

Capital Blue Cross contends that Evans is judicially estopped from arguing

that she is a qualified individual or seeking damages beyond March of 2016, because

she alleges in her state-court complaint seeking disability benefits that, as of March

of 2016, she has been unable to work.  (Doc. 37 at 18-19; see generally Doc. 38).  The

doctrine of judicial estoppel bars parties from making contradicting statements in separate proceedings.  See Detz v. Greiner Indus., Inc., 346 F.3d 109, 115 (3d Cir. 2003) (citations omitted).  This doctrine has special application in cases involving plaintiffs who have made statements regarding their status as a "qualified individual" in the ADA context and their status as "disabled" in the disability context.  See id. at 117 (citing Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 807 (1999); Motley v. N.J. State Police, 196 F.3d 160, 164-66 (3d Cir. 1999)); Bisker v. GGS Info. Servs., Inc., 342 F. App'x 791, 795 n.5 (3d Cir. 2009) (nonprecedential) (citing, inter alia, Turner v. Hershey Chocolate U.S., 440 F.3d 604, 607 (3d Cir. 2006)) (private disability plan).  We must first determine whether the two statements conflict, and, if they do, the plaintiff must explain the inconsistency.  See Detz, 346 F.3d at 116 (quoting Cleveland, 526 U.S. at 798).

Evans' two statements are at odds.  She claims in this case that she was able to work with or without an allergy-related accommodation beyond March of 2016; she pled in her disability complaint that she has been unable to work in any job beyond March of 2016 due to her mental health.  The latter statement (that she could not work at all) contradicts the former (that she could work with or without accommodation).  See id. at 120 (citation omitted); see also Ehnert v. Washington Penn Plastic Co., 812 F. App'x 71, 75 (3d Cir. 2020) (nonprecedential); Tierney v. Geisinger Sys. Servs., No. CV 3:17-1048, 2020 WL 6119271, at *12 (M.D. Pa. Oct. 16, 2020).

Evans' attempt to reconcile these statements by reference to the ADA's unique statutory scheme is unavailing.  True, "statements in support of [a disability

benefits] application do not take into account . . . the concept of reasonable accommodation under the ADA and, therefore, do not necessarily estop a claim under the ADA that one is capable of performing the essential functions of one's position *with reasonable accommodation*." Turner, 440 F.3d at 609. But "simply averring that the statutory schemes differ is not enough to survive summary judgment." Motley, 196 F.3d at 166. Evans does not endeavor to explain how a reasonable accommodation—or what type of accommodation—would have enabled her to work despite her mental health and allergy conditions. See Jones v. Southcentral Emp. Corp., 488 F. Supp. 2d 475, 489-90 (M.D. Pa. 2007); see also Detz, 346 F.3d at 118 (explanations should describe how representations "leave room for the possibility that the plaintiff is able to meet the essential demands of the job to which he claims a right under the ADA"). Instead, she simply points to the ADA and its consideration of reasonable accommodations. (Doc. 57 at 9-11). She has therefore failed to provide a sufficient explanation that could lead a reasonable juror to conclude that she could both make her disability claim in good faith and perform her essential job functions with or without a reasonable accommodation. Cleveland, 526 U.S. at 807. Evans is thus judicially estopped from claiming that she was a qualified individual for purposes of the ADA *after* the filing of her state disability complaint. The parties shall address the implications of this holding on the scope of Evans' available remedies in their pretrial memoranda.

### 2.   *Failure to Accommodate*

Evans claims Capital Blue Cross denied her a reasonable accommodation. Evans identifies three broad categories of accommodations that would have been

reasonable: remove and replace the suspect cubicle panel, permit her to use an air filtering device, or allow her to work from home.  (Doc. 41 at 21).  In her deposition, and in response to Capital Blue Cross's Rule 56.1 statement, Evans explained that she made other suggestions too, such as having the panel cleaned or moving her to another desk.  (See Doc. 50-2 ¶ 19 (citing Doc. 36-1 at 85)).  The parties debate *ad nauseum* whether Evans' requested accommodations were reasonable, whether the parties participated in the requisite interactive process, and whether Evans' requests would have imposed an undue burden.  Capital Blue Cross also claims that it did accommodate Evans by having her cubicle professionally cleaned and, eventually, moving her to a new workspace.  (Doc. 37 at 6-9; Doc. 48 at 13-19).

Having carefully reviewed the record, we conclude that manifold factual disputes preclude summary judgment in favor of either party on this claim.  The record is unclear as to the precise length of time it took Capital Blue Cross to accommodate Evans.  Failure to appropriately and timely respond to an employee's efforts to secure accommodation may form the basis for an ADA claim.[10]  Crediting Evans' testimony, a jury could conclude that Capital Blue Cross failed to engage in reasonable efforts to timely or fairly address her requested accommodations.  The back-and-forth on Evans' requests took an inexplicably long time, and, more

---

[10] See, e.g., McCray v. Wilkie, 966 F.3d 616, 621 (7th Cir. 2020) (citing Jay v. Intermet Wagner, 233 F.3d 1014, 1017 (7th Cir. 2000) (ADA); Valle-Arce v. Puerto Rico Ports Auth., 651 F.3d 190, 200-01 (1st Cir. 2011) (ADA); Mogenhan v. Napolitano, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (Rehabilitation Act); Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1262 (10th Cir. 2001) (ADA)); O'Dell v. Dep't of Pub. Welfare of Pa., 346 F. Supp. 2d 774, 786 (W.D. Pa. 2004); O'Dell v. Dep't of Public Welfare, No. 3:02-130J, 2004 U.S. Dist. LEXIS 23585, at *25-26, 32 & n. 8 (W.D. Pa. Nov. 10, 2004) (reconsideration opinion).

problematically, the record is vague as to exactly what transpired with Evans'
requests during that time.  For example, there is no clear record regarding what
happened with Evans' request—supported by multiple physicians and Capital Blue
Cross's own on-site nurse—for permission to use a medically necessary air filter.
In light of these and other factual disputes, we cannot conclude that either party is
entitled to judgment as a matter of law.  We will therefore deny summary judgment
to both parties on this claim.[11]

### B.    Disability Retaliation

Evans alleges Capital Blue Cross retaliated against her in violation of the
ADA.  To establish a *prima facie* case of ADA retaliation, plaintiffs must show
(1) they engaged in a protected activity, (2) the employer subjected them to an
adverse employment action, and (3) there is a causal connection between the
protected activity and the allegedly adverse action.  Shaner v. Synthes, 204 F.3d
494, 500 (3d Cir. 2000) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d
Cir. 1997)).  Protected activity includes a good-faith request for accommodation,
Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010) (citing
Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir. 2003)), and both
parties acknowledge such requests were made in this case, (see Doc. 37 at 22-24;

---

[11] Capital Blue Cross claims that Evans' request to work from home
would have created an undue hardship.  (See Doc. 37 at 12-13); see also 42 U.S.C.
§ 12112(b)(5)(A).  Even if Capital Blue Cross could prove that assertion, its argument
would not be dispositive, because it responds to just one of Evans' requests.  Capital
Blue Cross does not raise this argument in response to Evans' other proposed
accommodations.

Doc. 50 at 24-26).  Capital Blue Cross challenges only the second and third elements of Evans' *prima facie* case.

To establish an adverse employment action in the retaliation context, a plaintiff must prove that a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks omitted); Kocher v. Mun. of Kingston, 400 F. Supp. 3d 138, 153 (M.D. Pa. 2019).  As for causation at the *prima facie* stage, the plaintiff must "produce evidence sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action."  Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 259 (3d Cir. 2017) (citation and internal quotation marks omitted) (alteration in original); see also Kieffer v. CPR Restoration & Cleaning Servs., LLC, 733 F. App'x 632, 638 (3d Cir. 2018) (nonprecedential) (quoting Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)).[12]  The plaintiff can rely on, *inter alia*, "an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive.'"  Carvalho-Grevious, 851 F.3d at 260 (internal citations omitted). Otherwise, we look to the evidence *in toto* to determine whether it supports an inference of retaliation.  Id. (citation omitted).

---

[12] Retaliation claims brought under Title VII and the ADA are subject to the same framework.  Keyhani v. Trs. of Univ. of Pa., 812 F. App'x 88, 92 (3d Cir. 2020) (nonprecedential) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013); Krouse, 126 F.3d at 500).

Evans fails to establish retaliation on her first theory, that Capital Blue Cross increased its scrutiny of her.  Quite simply, Evans cites no evidence in her Rule 56.1 statement or her brief establishing she was subjected to some form of greater accountability or harsher treatment.  (See Doc. 29 ¶¶ 44-49; see also Doc. 50 at 24; Doc. 50-2 ¶ 48).  Therefore, she has not established a genuine dispute of material fact as to adverse employment action, and we will grant summary judgment as to this theory.

Evans' next argument—that Capital Blue Cross retaliated against her by removing her high-back chair—warrants more discussion, but we will grant summary judgment on this issue as well.  Evans cites deposition testimony from a Capital Blue Cross coworker who stated that a member of the facilities staff, before seizing Evans' chair, said "[Evans is] always trying to do something.  She's nothing but a troublemaker."  (Doc. 50 at 25 (citation omitted)).  Evans speculates that the temporal proximity between this statement and the removal of the chair "suggests that [Evans] was subjected to retaliatory animus possibly for exercising her [ADA] rights."  (Id.)  These statements do not relate to Evans' disability-based complaints.  Evans seems to recognize this disconnect, noting this temporal proximity *"possibly"* suggests retaliatory animus.  (Id. (emphasis added)).  But that is not what the law requires—Evans must show, not speculate, that her protected activity was the "likely" reason for the challenged action.  Carvalho-Grevious, 851 F.3d at 253.

Evans' theory regarding confiscation of her high-back chair fails for a second reason: it does not constitute an adverse employment action.  Replacement of a high-back chair with a low-back chair plainly constitutes a quintessential "petty

slight[] or minor annoyance[]" the Supreme Court has said would not constitute adverse action, <u>Burlington N.</u>, 548 U.S. at 68, and Evans has not argued otherwise. We also note that Evans obtained a replacement high-back chair after Ketner seized hers, (Doc. 50-2 ¶ 46), suggesting that Ketner's confiscation was but a minor and temporary inconvenience. We will thus grant summary judgment to Capital Blue Cross as to Evans' claim for retaliation under the ADA.

### C.     Race Discrimination

Evans claims Capital Blue Cross discriminated against her because of her race in violation of Title VII and Section 1981. Race discrimination claims under Title VII and Section 1981 are reviewed under the same standard. <u>See</u> <u>Brown v. J. Kaz, Inc.</u>, 581 F.3d 175, 182-83 (3d Cir. 2009) (citing <u>Schurr v. Resorts Int'l Hotel, Inc.</u>, 196 F.3d 486, 499 (3d Cir. 1999)). Both parties agree the familiar <u>McDonnell Douglas</u> three-step burden-shifting framework applies in this case, and that only the *prima facie* showing is at issue.[13]

Evans' amended complaint does not provide a detailed description of alleged racial discrimination at Capital Blue Cross. We interpret her pleading—illuminated to a degree by her Rule 56 briefing—to state two race-based claims: that Capital Blue Cross (and Schreck in particular) created a hostile work environment, and that Capital Blue Cross engaged in disparate treatment of Black and Caucasian

---

[13] Capital Blue Cross does not tailor its opening summary judgment brief regarding hostile work environment to both Evans' Section 1981 and Title VII claims. However, given that it seeks summary judgment on both in its motion, (<u>see</u> Doc. 37 at 25-29, 31-35), and Evans appears to contest her hostile work environment claims in general, (<u>see</u> Doc. 50 at 26-29), we will treat the challenge as one to both counts.

employees.  (See Doc. 29 ¶¶ 89-93, 98-104; see also Doc. 50 at 26-29; Doc. 37 at 25-29;

Doc. 59 at 16-18).

To establish a *prima facie* case of disparate treatment, a plaintiff must

demonstrate (1) she is a member of a protected class, (2) she was qualified for

the relevant position, (3) she suffered an adverse employment action, and (4) the

circumstances give rise to an inference of discrimination.  See Makky v. Chertoff,

541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas Corp. v. Green, 411 U.S.

792, 802 (1973); Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n.5

(3d Cir. 1996) (*en banc*)); Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013).  A

plaintiff can also prove race discrimination based on a hostile work environment

theory.  See Greer v. Mondelez Glob., Inc., 590 F. App'x 170, 173 (3d Cir. 2014)

(nonprecedential) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66-67

(1986); Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)).  For a hostile work

environment claim, a plaintiff must prove (1) intentional discrimination because of

race, (2) severe or pervasive discrimination, (3) a detrimental effect on the plaintiff,

(4) discrimination that would affect a reasonable person, and (5) *respondeat superior*

liability.  Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (quoting Mandel

v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)).

Evans has failed to demonstrate a genuine dispute of fact as to her hostile

work environment claim.  Evans levies her race-based accusations against Schreck

alone.  (See Doc. 50-2 ¶ 47).  In her deposition, Evans broadly accused Schreck of

discriminating against her based on race.  (Id.)  Evans did not elaborate upon this

accusation, (see Doc. 50-1 at 9), and nothing in the Rule 56 record suggests that

Schreck's conduct was even potentially race-related.  *Per contra*, the evidence establishes that Schreck had an intense management style toward others, (see Doc. 36-1 at 125-27, 134), and that Evans was not the only employee on the receiving end of Schreck's "outburst[s]," (see Doc. 50-2 ¶ 3).  The rhetorical questions that Evans poses in her briefing—*e.g.*, "Was Plaintiff receiving unfavorable treatment because of her race?"—are mere speculation and do not carry her Rule 56 burden.  See Knauss v. Dwek, 289 F. Supp. 2d 546, 550 (D.N.J. 2003) (citing Anderson, 477 U.S. at 249).  Therefore, we will grant summary judgment to Capital Blue Cross on Evans' hostile work environment claim.

Evans has adduced sufficient evidence, however, for her disparate treatment claim to survive summary judgment.  A jury could conclude from the record that Capital Blue Cross allowed Evans' complaints and requests regarding her cubicle to languish.  (See, e.g., Doc. 57-1 at 7; Doc. 42 ¶ 27; Doc. 57 at 5).  Yet, when a Caucasian employee raised the same concern, Capital Blue Cross promptly arranged for a professional air quality investigation and mold testing.  (See Doc. 42 ¶ 41; Doc. 36-1 at 68).  Ketner claims in his declaration that he ordered mold test kits "in response to Evans' request," but he also states that it was not until Evans and her Caucasian coworker jointly complained that professional testing was ordered. (See Doc. 36-1 at 119).  Given this timeline, a reasonable juror could infer disparate treatment based on race.  Genuine disputes of material fact therefore preclude summary judgment on Evans' disparate treatment claim.

### D.      Worker's Compensation Act Preemption

Capital Blue Cross argues Evans' claims related to her "breathing disability and to all non-pecuniary damages" are preempted by the Pennsylvania Worker's Compensation Act ("WCA"), 77 PA. CONS. STAT. 481.  (Doc. 37 at 22).  We find no merit to this argument.  The WCA is the exclusive means of recovery for injuries sustained during the course of and within the scope of one's employment.  Tooey v. AK Steel Corp., 81 A.3d 851, 857 (Pa. 2013) (quoting 77 PA. CONS. STAT. 481(a)). The statute serves "to compensate claimants for earnings loss occasioned by work-related injuries."  Id. (quoting City of Erie v. W.C.A.B. (Annunziata), 838 A.2d 598, 602 (Pa. 2003)).  It consequently establishes the only means by which employees may assert certain *tort* claims against employers based on discriminatory treatment. Id. (quoting Sporio v. W.C.A.B. (Songer Constr.), 717 A.2d 525, 530 (Pa. 1998); Markle v. W.C.A.B. (Caterpillar Tractor Co.), 661 A.2d 1355, 1357 (Pa. 1995)); Poyser v. Newman & Co., 522 A.2d 548, 550 (Pa. 1987); see also Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 940 (3d Cir. 1997), abrogated on other grounds by Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999).

Capital Blue Cross cites Cook v. SugarHouse HSP Gaming, L.P., No. 2661 EDA 2016, 2017 WL 6420317 (Pa. Super. Ct. Dec. 18, 2017), in support of its argument that the WCA is the only avenue for relief for any exacerbation of her condition stemming from Capital Blue Cross's alleged discrimination, harassment, or retaliation.  (Doc. 37 at 22).  Cook is inapposite.  That court affirmed dismissal of negligent and intentional infliction of emotional distress claims based on injuries stemming from alleged unlawful practices by the employer.  See Cook, 2017 WL

6420317, at *4.  Neither Capital Blue Cross nor the court has identified cases extending this reasoning from state tort claims to federal statutory claims. Accordingly, we conclude that the WCA does not preempt Evans' Title VII claims.

**IV.**   **Conclusion**

We will deny Evans' motion (Doc. 39) for summary judgment, grant in part and deny in part Capital Blue Cross's motion (Doc. 35) for summary judgment, and deny Capital Blue Cross's motion (Doc. 49) to strike.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     March 4, 2021